54 So.2d 464

**STEVENS v. DEATON TRUCK LINE, Inc.**

**7 Div. 991.**

Supreme Court of Alabama.

Oct. 11, 1951.

Embry & Embry, Pell City, and D. G. Ewing, Birmingham, for appellant.

Francis H. Hare and R. Clifford Fulford, Birmingham, for appellee.

LAWSON, Justice.

This is a suit by Freeman Stevens, a minor, who sued by his next friend, Grady Stevens, Sr., against Deaton Truck Line, a corporation, and Walter Roberts to recover damages for personal injuries sustained by the said minor when an automobile in which he was riding as a passenger collided with a motor vehicle driven by Walter Roberts. Liability was sought to be fixed on Deaton Truck Line, a corporation, hereafter referred to as Deaton, under the doctrine of *respondeat superior*.

At the conclusion of the evidence offered by the plaintiff and both defendants, the trial court granted the motion of Deaton to exclude the evidence as to it. Upon request, the trial court gave the general affirmative charge without hypothesis for the defendant Deaton. This charge amounted to a directed verdict for that defendant. A verdict in favor of Deaton was returned by the jury and judgment was in accord with the verdict. As to the defendant Walter Roberts, the jury was unable to agree and a mistrial was declared as to plaintiff's claim against that defendant.

From the judgment in favor of Deaton, plaintiff appealed to this court. Subsequent to appeal and prior to submission the minor, Freeman Stevens, was killed and this cause was revived in the name of his administrator, Grady Stevens, Sr.

Laying aside the question as to whether it was proper to grant the motion to exclude the evidence, Johnson v. Shook & Fletcher Supply Co., 245 Ala. 123, 16 So. 2d 406; Mt. Vernon-Woodberry Mills v. Little, 222 Ala. 605, 133 So. 710, we come to the question of whether the trial court erred in directing a verdict in favor of Deaton. It is settled that where by the undisputed evidence plaintiff had not shown that he is entitled to recover on his complaint, a court may direct a verdict for defendant, and it is immaterial whether the jury believe the evidence or not. In either event plaintiff has not proven his complaint. Cannon v. Louisville & N. R. Co. et al., 252 Ala. 571, 42 So.2d 340; O'Bar v. Southern Life & Health Ins. Co., 232 Ala. 459, 168 So. 580, and cases cited.

On and prior to May 20, 1947, the defendant Walter Roberts owned a truck-tractor and a trailer which, when operated together, were capable of hauling freight. Deaton was engaged in the business of hauling freight as a common carrier both intrastate and interstate. It had permits or certificates of convenience and necessity issued by the regulatory agency of this and other states and by the Interstate Commerce Commission. On May 20, 1947, Walter Roberts and Deaton executed the following instrument:

"This lease agreement is made this 20th day of May, 1947, between W. E. Roberts, hereinafter called the Owner, and Deaton Truck Line, Inc., hereinafter called Company, as follows:

"1. Owner hereby rents, leases and delivers to the Company the exclusive control of the following described motor vehicle: No. 30–1946 Model Chevrolet, Motor No. DEA–451291, Ala. Tag 1H2–5332 & 1946 Model Alabama Trailer, Serial No. L–46309, 28', Flat, Ala. Tag 1T2–921.

"Upon the terms and conditions set out below.

"2. The Company shall have the exclusive use and control of the said vehicle for the entire term of this lease, and the said vehicle shall be used for the transportation of freight, both intrastate and interstate, under the authority of the Company, and for no other person, Firm or Corporation.

"3. This lease may be terminated by either party after giving the other thirty days written notice of termination; and shall continue for one year from date here-

of and from year to year thereafter until so terminated.

"4. The Company agrees to pay as rent to the Owner for the use of said vehicle, the following percentages of gross revenue derived by the Company from the operation of said vehicle, subject to the provisions of other Paragraphs hereof:

"82½% on all freight classified in the National Motor Freight Classification as 6th Class or higher. 87½% on all freight classified in the National Motor Freight Classification as 7th Class or lower.

"5. All identification plates, both State and Federal (but not including license tags) shall be bought in the name of the Company and paid for by the Company, and shall be displayed on this vehicle as long as this lease remains in effect. Upon the termination of this lease, the said plates shall remain the property of the Company and may be removed by it, together with all signs which may be painted on said vehicle. Owner has, or will, deposit $150.00 with the Company to guarantee performance of all provisions of this lease, and agree that any sums expended by the Company to carry out this paragraph hereof, and to reimburse the Company for any expenses caused by the Owner violating any paragraph hereof, shall be deducted from the said deposit; the remainder thereof, if any, shall be refunded to the Owner not less than sixty days after termination of this lease.

"6. Owner agrees to keep the said vehicle in good mechanical condition and repair at his own expense for the duration of this lease, and further agrees to pay all costs of operating same, including without restricting the generality of the above, claims for cargo shortages, gasoline, oil, tires, parts repairs, greasing, tarpaulins, fines for any cause, driver's salary, and permit fees charged by any State for the transportation of property on the said vehicle in such State. For the payment of all his obligations set out in this lease, owner waives all rights of exemption under the Constitution and Laws of the State of Alabama or any other State, and agrees to pay a reasonable Attorney's Fee, if the employment of an Attorney is necessary to collect same.

"7. The Company will pay all mileage taxes imposed by any State for the operation of said vehicle, when operated in accordance with provisions of this lease; and will pay all cargo, property damage and public liability insurance premiums on the said vehicle when used in accordance with the provisions of this lease. The Owner, in addition to the expenses mentioned in Paragraph 6 above, will pay for State License Tags on said vehicle, and pay Collision, Fire, and Theft Insurance premiums on the said vehicle, if any such insurance is carried; and in the event that the Owner is indebted to the Company for any reason, it is agreed that the said Collision, Fire & Theft Insurance must be carried by the Owner in an amount not less than his indebtedness to the Company, payable to the Company and the Owner as their respective interests may appear. Insurance in excess of standard coverage, which may be required from time to time, if any, shall also be paid by the Owner. All Insurance Policies referred to above must be written by Insurance Companies acceptable to the Company.

"8. In the event the driver of the said vehicle violates any rule or regulation of the Interstate Commerce Commission, or any Federal, State or Municipal Law or Ordinance, and as the result of such violation the Company is fined in any Court, Owner will reimburse the Company for such fine and all expenses in connection therewith. Owner will also reimburse the Company for any and all freight charges which the Driver of the said vehicle may collect and fail to remit to the Company.

"9. Owner agrees to buy 300 shares of common stock of the Company at and for the total price of $3,000.00, from any source the Company can secure same for Owner. This purchase price is payable $50.00 per week; and to secure the payment thereof Owner hereby assigns to the Company as agent for the Seller of such stock 12½% of the gross revenue derived by the Company from the operation of the vehicle under this lease, to be deducted from rent payable by Company to Owner under the terms hereof.

"10. In the event Owner defaults in such payments, or terminates this lease agreement, then at the option of the Seller of said Stock, this purchase agreement shall be null and void and Owner forfeits all amounts previously paid on such purchase price. No share of said stock shall be considered paid for in full and delivered to Owner, until the entire number of shares hereby purchased is paid for in full.

"11. The Seller of said Stock has deposited same in escrow to guarantee delivery thereof to Owner when payment therefor has been completed; but all voting rights in such stock shall remain in present owner thereof until purchase price is paid in full as above provided. Interest at the rate of 6% per annum on unpaid balance shall be charged.

"Witness our hands and seals at Birmingham, Alabama, this, the 20th day of May, 1947.

"/s/ W. E. Roberts
"(Owner)
"Deaton Truck Line Inc.
"By /s/ W. E. Whitman, Sec.
"(The Company)"

It was the contention of the plaintiff below that by virtue of the provisions of the instrument set out above and the evidence as it related to the manner in which the parties operated under it, the relationship of master and servant existed between Deaton and Roberts. It is clear from this record that the trial court agreed with plaintiff as to such relationship, but excluded the evidence as to Deaton and directed a verdict in its favor on the ground that the evidence was not sufficient to show that at the time of the accident Walter Roberts was acting within the line and scope of his employment.

Agreements more or less similar to the one entered into between Deaton and Roberts have been before the courts of other jurisdictions. In some of the cases the relationship between the parties was held to be that of master and servant and the lessee has been charged with the negligence of the lessor (owner of the vehicle) where the latter at the time of the negligent act was acting within the line and scope of his employment. Gas City Transfer Co., Inc., v. Miller, 107 Ind.App. 210, 21 N.E.2d 428;

Universal Carloading & Distributing Co., Inc., v. McCall, 107 Ind.App. 479, 25 N.E. 2d 253; Sanford v. Goodridge, 234 Iowa 1036, 13 N.W.2d 40; Rogers v. Silver Fleet System of Memphis, La.App., 180 So. 445; Gulf Coast Motor Express Co., Inc., v. Diggs, 174 Miss. 650, 165 So. 292; Bates Motor Transport Lines v. Mayer, 213 Ind. 664, 14 N.E.2d 91. In other cases it has been held that even though the lessor be said to be an independent contractor, nevertheless the lessee is chargeable with the negligence of the lessor in the carrying out of the undertaking for which he contracted. Kemp v. Creston Transfer Co., D.C., 70 F.Supp. 521; Venuto v. Robinson, 3 Cir., 118 F.2d 679; Hodges v. Johnson, D.C., 52 F.Supp. 488. As we understand the Federal decisions cited above, liability was fixed on the lessee under the rule that "an individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for bodily harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity." Restatement of the Law of Torts, § 428, p. 1149.

■ We are inclined to agree with the trial court that under the evidence in this case Roberts, when carrying out his duties under the terms of the contract, was a servant or employee of Deaton rather than an independent contractor.

■ But such status or relationship in and of itself was not sufficient to make Deaton liable for the negligence of Roberts under all circumstances. To recover against Deaton upon the theory of *respondeat superior* it was incumbent upon plaintiff to show that the act done was within the scope of Robert's employment and was committed in the accomplishment of objects within the line of his duties, or in or about the business or duties assigned to him by his employer. Smith v. Brown-Service Ins. Co., 250 Ala. 613, 35 So.2d 490.

■ We come now to consider the evidence as it bears on the question of whether Roberts, at the time of the accident, was

acting within the line and scope of his authority, and since the trial court directed a verdict in favor of Deaton on the ground that the evidence was insufficient to show that Roberts was acting within the line and scope of his authority, we must view the evidence in its most favorable aspect for the plaintiff. Sullivan v. Alabama Power Co., 246 Ala. 262, 20 So.2d 224. If, when so viewed, a reasonable inference may be drawn from the evidence to substantiate the claimed culpability of Deaton, then the question was for the jury. Birmingham Electric Co. v. McQueen, 253 Ala. 395, 44 So.2d 598.

Deaton's place of business, its terminal, was located in the city of Birmingham. Deaton operated almost entirely under lease agreements similar, if not identical, with that which it had with Roberts, although there is some evidence that it owned a few trucks which were operated by drivers employed by it. Deaton operated approximately sixty-five trucks under the lease agreements. Most of the lessors lived in Birmingham. Those living outside Birmingham used their automotive equipment in going to and from their homes. Deaton's officials were aware of such practice, but had never expressly consented to it. Such practice was not forbidden. Most of the equipment owned by residents of Birmingham was stored on the lot at the terminal.

The practice usually followed by the owners, lessors, to determine whether they were to haul freight at a given time was to go to the terminal in Birmingham to see if their name or number was posted on a call board designed and used for that purpose. But the equipment under lease to Deaton was at all times subject to Deaton's orders and the owners were occasionally called at their homes when needed. Sometimes when such calls were made the owner would proceed to the point where the freight was to be picked up without going by the terminal in Birmingham. On occasion the owner would return to his home after making delivery, without returning to the terminal. Roberts had no arrangement with Deaton to call him at his home and he never left his home and went direct to the place where he was to pick up the cargo, but on a few occasions he did return to his home after delivery was completed without going by the terminal.

Roberts lived at Ashville, a town approximately forty-five miles northeast of Birmingham. Roberts usually went through Springville in going to the terminal and returning to his home. That is the shortest and most direct route.

The accident out of which this lawsuit arises occurred at approximately 8 o'clock on the night of Tuesday, September 9, 1947, in Pell City, Alabama, at the intersection of Railroad Avenue and Highway 25. The automobile in which plaintiff below was riding was moving in a northeasterly direction along Railroad Avenue and the vehicle driven by Roberts was travelling in a northerly direction on Highway 25.

Roberts had hauled no freight for Deaton on the day of the accident nor for a week prior thereto. But he was at the terminal on the day of the accident and, while the evidence does not show affirmatively the purpose of his visit, we think the evidence supports the inference that he was there to see if it was his time to haul freight. While at the terminal on the day of the accident, Roberts came in contact with one Walker, who operated his automotive equipment under an agreement with Deaton similar to that under which Roberts operated. Walker told Roberts that one Harper, who lived at Easonville, a small town a few miles south of Pell City, was interested in buying his equipment. Roberts decided to contact Harper.

At about 4:00 p.m. on the day of the accident, Roberts and Walker left Deaton's terminal in Birmingham enroute to Harper's home in Easonville. Roberts was riding in his truck-tractor. The trailer was not attached, but was left in the yard at the terminal. Walker followed in his truck. They proceeded in an easterly direction until they reached Leeds, where Roberts had some repairs made on the engine of his truck-tractor, which repairs were necessary to correct a defect occurring subsequent to leaving Birmingham. The cost of the repairs was paid by Roberts. After such repairs were made, Roberts and Walker continued to drive their respective motor

vehicles in an easterly direction until they reached Pell City, approximately thirty-five miles from Birmingham, and almost due east of Birmingham. Upon reaching Pell City, they turned south and proceeded to Cropwell, a small town two or three miles south of Pell City. Walker lived at Cropwell, and upon reaching his home, he left his truck and entered the truck-tractor of Roberts. Roberts and Walker then rode in the former's vehicle to Easonville, a short distance south of Cropwell. Upon arriving at Easonville they contacted Harper. The only matter discussed with Harper was the sale of Roberts' equipment. Negotiations were not completed at that time. However, a few days after the accident, Roberts sold his equipment to Harper and at the time of the trial Deaton's name still appeared on the cab of the truck-tractor. On the day of the accident, Roberts and Walker, after concluding the conversation with Harper, drove in a northerly direction in Roberts' truck-tractor until they reached Cropwell, where Walker got out. Roberts then continued on toward Pell City enroute to his home in Ashville, eighteen or nineteen miles north of Pell City. As before indicated, at the time of the accident Roberts was travelling in a northerly direction, on Highway 25, which highway led to his home.

At the time of the accident Roberts' truck-tractor bore an Alabama license, which had been paid for by him and which was issued in his name. On the cab of the truck-tractor was painted "Deaton Truck Line" and the numbers of the permits issued by the various regulatory bodies to Deaton. This painting had been placed on the cab by some one selected by Deaton, but whose services were paid for by Roberts.

Deaton had no knowledge of the fact that Roberts was going to see Harper or that he would be in the vicinity of the place where the accident occurred.

Any evidential value from the fact that Deaton's name was on the vehicle was removed by the concession that the vehicle was at the time of the accident owned by Roberts. In Venuto v. Robinson, supra, 3 Cir., 118 F.2d 681, wherein the liability of a lessee under an agreement similar to the one between Deaton and Roberts was involved, it was said: " * * * Although the trailer bore the name of the Ross company thereon, it was conceded by the plaintiffs that Robinson was the owner of the tractor and trailer. Since a finding of agency arising out of the name on the vehicle depends upon the inference that the vehicle is owned by the person whose name appears thereon, Wigmore on Evidence, 3d Ed., § 2510a, the concession of ownership in Robinson removes any evidential value from the fact that Ross' name was on the vehicle."

There is nothing in this record to show that Deaton ever sought to control the use of Roberts' automotive equipment except as to its use in hauling freight. The fact that Deaton had the power to prevent the lessor from using such equipment as a means of transporting himself does not, in our opinion, in and of itself make Deaton responsible for the negligence of the owner, lessor, when so used.

It is clear to us that the view of the evidence most favorable to the plaintiff is that Roberts had completed his mission with Harper, which was purely personal, and at the time of the accident had resumed his journey from the terminal to his home. In other words, at the time of the accident, Roberts, an employee of Deaton, was returning to his home at Ashville from Deaton's terminal, where he had been to see if there was any work for him, in the truck-tractor which he owned, but which was leased to Deaton and which, under the terms of the lease agreement, Deaton had the right to control. However, he was not travelling the shortest route and that usually travelled by him in going to and returning from the terminal.

Deaton's right to control under the provisions of the agreement was certainly no greater than if he had owned the vehicle. In Smith v. Brown-Service Ins. Co., supra [250 Ala. 613, 35 So.2d 493] we said: "The general rule is that an employee using an automobile, whether belonging to his master or to himself, in going to and from his place of work, is not at such times

236

regarded as engaged in work for his master but is acting solely for his own purposes. [Authorities cited]."

We can see no possible benefit which Deaton could have derived from the trip which resulted in the accident. No freight was being hauled and none could be hauled until the trailer was attached. As before shown, it was in Birmingham at Deaton's terminal.

We are clear to the conclusion that the evidence in this case, when viewed in the light most favorable to the plaintiff, fails to show that at the time of the accident Roberts was engaged in the accomplishment of objects within the line of his duties or in or about the business or duties assigned to him by his employer, but does show that at such time Roberts was driving the truck-tractor on a mission of his own for his sole benefit. It was, as far as this record discloses, entirely immaterial with Deaton as to how Roberts got from his home to the terminal and back to his home. Such being the nature of the testimony, we think the trial court's action in directing a verdict for Deaton was correct. Hill v. Decatur Ice & Coal Co., 219 Ala. 380, 122 So. 338; Smith v. Brown-Service Ins. Co., supra; Ware v. Roadway Express, Inc., D.C., 81 F.Supp. 893; Kirtland v. Interstate Motor Freight System, 53 Ohio App. 459, 5 N.E.2d 707.

The judgment of the trial court is affirmed.

Affirmed.

LIVINGSTON, C. J., and FOSTER, SIMPSON and GOODWYN, JJ., concur.