**KAPLAN TRUCKING COMPANY,**
**Appellant,**

v.

**Shirley LAVINE, Appellee.**

No. 13232.

United States Court of Appeals
Sixth Circuit.

March 11, 1958.

Burns Weston, Cleveland, Ohio (Mark O'Neill, Cleveland, Ohio, of counsel; McConnell, Blackmore, Cory, Burke & Kundtz, Cleveland, Ohio, on the brief), for appellant.

Craig Spangenberg, Cleveland, Ohio (Ralph Rudd, Cleveland, Ohio, of counsel; Harrison, Spangenberg & Hull, Cleveland, Ohio, on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and STEWART, Circuit Judges.

STEWART, Circuit Judge.

The appellee was injured in a collision between an automobile in which she was a passenger and a truck being driven by Milton Fotta, an employee of the truck's owner, John Mogielski. At the time of the collision, December 31, 1953, Mogielski had leased the truck to the appellant, Kaplan Trucking Company. This appeal is from a judgment entered upon a jury verdict in favor of the appellee.

Neither the validity of the lease, the negligence of Fotta, nor the amount of the judgment are here in question. The appellant Kaplan challenges solely the finding that at the time of the collision Fotta was acting as the servant of Kaplan

so as to impute liability to Kaplan under the doctrine of *respondeat superior*. The appellant contends that the district court should have directed a judgment in its favor, and, alternatively, that even if the agency issue was sufficiently doubtful to warrant submission to the jury, the court's instructions were erroneous and prejudicial. For the reasons hereafter discussed, it is our conclusion that the district court did not err in submitting the case to the jury, but that the judgment must be set aside for a new trial because of inadequacy of the court's instructions upon the question of agency.

At the time of the collision Kaplan was an interstate motor carrier holding permits from the Interstate Commerce Commission and the public utilities commissions of the states in which it operated. Part of Kaplan's business was carried on with its own fleet of trucks, but in accordance with the custom of the industry it also leased from independent owners much of the equipment which it operated. The leases were either for definite periods of time or "trip leases" for a particular delivery. Mogielski was one of the independent owners from whom Kaplan leased equipment on a long-term basis. Kaplan leased two trucks from Mogielski for a one year term; Mogielski himself was the driver of one of the trucks and Mogielski's employee, Fotta, the driver of the other. By the terms of the lease, Mogielski received seventy-five percent of the revenue derived by Kaplan from the use of his vehicles. From this, he was obliged to pay all operating expenses, including Fotta's compensation. Mogielski did not possess permits to operate as a carrier, and his trucks were operated under Kaplan's permits while leased to it.

Fotta and Mogielski lived in Pittsburgh, and Kaplan's Pittsburgh terminal was their home terminal. Much of Kaplan's business originating there was the transportation of steel to points in other states. Since there was often a disparity between the volume of freight going out of Pittsburgh and that coming in, it was not unusual for the drivers to find that upon reaching their delivery point, there was no cargo to be carried back to Pittsburgh.

The duty of the drivers of leased equipment in this situation is not entirely clear in the record. Kaplan's representatives testified that the drivers were under instructions to report to the nearest Kaplan terminal, and, if no load was available, to return empty to the home terminal. However, it was uncontradicted that if no return load was available, some of the owner-lessors and their drivers, including Mogielski and Fotta, customarily made a trip lease with another trucking company, in order to avoid the expense of an empty return trip. It was admitted by Kaplan's representative that this practice was tolerated by Kaplan because of its inability to enforce a prohibition against trip leasing. It was also shown that despite its disapproval of the practice, Kaplan had on occasion entered into trip leases with drivers who were under permanent lease to other companies.

Five days before the accident, on December 26, 1953, Fotta made a trip for Kaplan from Pittsburgh to Columbus, Ohio, with a load of steel. From Columbus, instead of proceeding to Kaplan's nearest terminal at Middletown, Ohio, Fotta drove to Mansfield, Ohio where he made a trip lease with Transamerican Freight Lines, Inc., to carry a load to Buffalo, New York. After delivering his Transamerican cargo in Buffalo on December 31, Fotta set out to drive back empty to Pittsburgh. When he was approaching Mercer, Pennsylvania, about sixty miles from Pittsburgh, the collision occurred which became the subject of this action.

■■ Since the wrongful act occurred in Pennsylvania, we look to the law of that state to determine the question of Kaplan's liability. Although Mogielski was an independent contractor and Fotta was his employee, the appellant concedes at the outset that the law of Pennsylvania imposes the same liability as though Kaplan had been the owner of the truck and the employer of Fotta. A

motor carrier operating under a public franchise cannot escape its responsibility to the public by conducting its business through independent contractors. Kissell v. Motor Age Transit Lines, 1947, 357 Pa. 204, 53 A.2d 593. This view is in accord with that of other jurisdictions. E.g., Venuto v. Robinson, 3 Cir., 1941, 118 F.2d 679; Barry v. Keeler, 1947, 322 Mass. 114, 76 N.E.2d 158; Thornberry v. Oyler Bros. Inc., 1955, 164 Ohio St. 395, 131 N.E.2d 383; see Restatement, Torts, § 428.

The strong policy considerations supporting this exception to the general common law rule exempting a principal from liability for the negligent acts of an independent contractor were thoroughly discussed by this court in American Transit Lines v. Smith, 6 Cir., 1957, 246 F.2d 86. In that case the lessee trucking company was held liable for the negligence of the lessor driver occurring after his load had been delivered and he was returning empty to the lessee's terminal in Cleveland.[1] See also Hodges v. Johnson, D.C.W.D.Va.1943, 52 F.Supp. 488. Lehman v. Robertson Truck-A-Way, 1953, 122 Cal.App.2d 82, 264 P.2d 653.

This broad concept of responsibility parallels the policy of the federal agency entrusted with the regulation of the interstate trucking industry. Administrative Rule No. 4 of the Bureau of Motor Carriers, an agency of the Interstate Commerce Commission, sets out the circumstances under which a carrier may add to its equipment by leasing a vehicle and obtaining the services of its owner-driver:

"The lease or other arrangement by which the equipment of an authorized operator is augmented must be of such a character that the possession and control of the vehicle is, for the period of the lease, entirely vested in the authorized operator in such a way as to be good against the world, including the lessor; that the operation thereof must be conducted under the supervision and control of such carrier; that the vehicle must be operated by persons who are employees of the authorized operator, that is to say, who stand in the relation of servant to him as master."

■ To hold that liability is to be measured as though Kaplan were the owner of the truck and the employer of Fotta does not, however, at once dispose of this case. The question still remains whether at the time of the collision Fotta was acting within the scope of his employment. It is the actual relationship of the parties at the time of the collision that is controlling. Simon v. McCullough Transfer Co., 1951, 155 Ohio St. 104, 98 N.E.2d 19, 23.

It is the appellant's contention that the district judge should have held as a matter of law that Fotta was not acting within the scope of his employment for Kaplan when the collision occurred. In support of this position the appellant points out that in proceeding from Mansfield to Buffalo on the Transamerican trip lease Fotta had clearly departed from Kaplan's employment. Appellant contends further that in thereafter traveling from Buffalo to Pittsburgh, Fotta's intention was to return to his home for the New Year's holiday rather than to resume his service for Kaplan, so that the return journey served only his personal interest. Appellant cites two decisions exempting the lessee trucking company from liability for the negligence of a driver while proceeding to his own home. Stevens v. Deaton Truck Line, 1951, 256 Ala. 229, 54 So.2d 464; Van Hook v. Strassberger, Mo.App.1953, 259 S.W.2d 399.

■ In our opinion the question of whether Fotta was in the scope of his employment on Kaplan's business when the collision occurred was clearly one for the jury. In a memorandum denying a motion for a new trial the district court correctly pointed out the similarity between the present case and Marriott v. National Mutual Casualty Co., 10 Cir.,

1. Compare the result in a case involving a true trip lease. Costello v. Smith, 2 Cir., 1950, 179 F.2d 715, 16 A.L.R.2d 954.

1952, 195 F.2d 462. In that case the driver-owner had leased his equipment on a long term basis to a trucking company. As in the present case, after making a delivery and finding no return load available, the driver made a trip lease with another trucking company. After completion of the trip lease, and while the driver was heading for his home terminal, the collision occurred. The Court of Appeals for the Tenth Circuit held as a matter of law that upon completion of the trip lease the driver had resumed the course of his regular employment with the permanent lessee.

There are two important differences between the present case and the Marriott case, however, which operated to create factual questions for a jury here which were not present in that case. First, the collision in the Marriott case occurred while the driver was on a direct homeward route—as though in the present case it had occurred on a direct return route from Columbus to Pittsburgh. Second, in the Marriott case there was no suggestion that after the termination of the trip lease the driver was on a personal mission of his own, such as the contention here that Fotta was going to his home in Pittsburgh for the holidays, rather than to Kaplan's terminal. It is to be noted that in Marriott the court held that as a matter of law the long-term lessee is responsible for the driver's negligence unless he "was at the time of the injuries hauling freight for others *or acting beyond the scope of his employment*." 195 F.2d at page 466. It is precisely the latter issue which was one for jury determination here.

In submitting the issue the district judge instructed the jury:

"* * * if you find from the evidence that Fotta left Pittsburgh with a load of freight for Kaplan; and further find that Kaplan contemplated he might either return empty directly to Pittsburgh, or might carry a trip-lease load for another carrier and then return empty to Pittsburgh; and you further find that Fotta did trip lease to Transameri-can Freight Lines, Inc., for a load to Buffalo, completed his delivery in Buffalo, surrendered all his Transamerican papers in Buffalo, and then started back empty to Pittsburgh; and if you find he had a general intention after completing his return trip to report to Kaplan's Pittsburgh dispatcher for a load; then you must find that he was in Kaplan's transportation service under Kaplan's lease as he proceeded south on Route 19."

The court refused to give the following instructions requested by Kaplan:

"Where, however, a servant goes upon a mission of his own and makes a clear and complete deviation and departure from the scope of his master's business, then, as a matter of law, the master is not responsible for any act of the servant occurring during the period of such deviation.

"If you find that at the time of the collision the truck driver, Fotta, was upon a personal mission of his own and had made a clear and complete departure from the business of the Kaplan Trucking Company and the scope of his employment by that company, Kaplan would not be responsible for any act of his at the time of the collision, and accordingly, your verdict must be for the defendant."

While, as the appellee points out, these requested instructions were incomplete and certain of the wording requested was open to objection, Kaplan was entitled to have their substance imparted to the jury. The instructions actually given were inadequate to frame the issue to be decided. Where a servant departs from his authorized employment, he does not automatically reenter the scope of his employment upon completion of the deviation, despite his intention to continue serving his employer in the future. Whether he has returned to his employment is a question of fact to be determined under all the circumstances. Restatement, Agency, § 237. And cer-

tainly, a servant's "general intention" while on business of his own to return to the employer's business sometime afterwards does not convert the personal business into the employer's business.

■■    The jury should have been instructed to consider all the circumstances, including whether Fotta had implied permission to depart temporarily from Kaplan's employment, the geographical and temporal extent of the departure, and the purpose of Fotta's trip from Buffalo to Pittsburgh. Compare Chikowska v. Prado Garage, 1944, 349 Pa. 508, 37 A.2d 533; Martin v. Lipschitz, 1930, 299 Pa. 211, 149 A. 168; Graham v. Henderson, 1916, 254 Pa. 137, 98 A. 870; Freeman v. Salem Reformed Church, 1937, 125 Pa.Super. 367, 190 A. 159. Only if Fotta was furthering the business of Kaplan in driving from Buffalo to Pittsburgh on December 31, 1953, was he then acting in the scope of his employment as Kaplan's servant.

The judgment is set aside, and the case is remanded for a new trial.

ALLEN, Circuit Judge (dissenting).

I agree with the majority decision that a jury question was presented and that the motion for directed verdict was properly denied. I regret that I cannot agree that the case should be remanded for new trial.

As the basis for my reasons for dissent, certain evidence not quoted in the majority opinion must be reviewed. DeVaull, who testified for Kaplan, is the manager of all operations for Kaplan. He lives in a suburb of Cleveland, Ohio, and testifies very little as to the situation at the Pittsburgh terminal. DeVaull says that Tillery, the dispatcher of the Kaplan Pittsburgh terminal, was in charge of the operation of Mogielski's two trucks, one of the drivers being Fotta. The situation and practice of Kaplan at Pittsburgh are all-important in this case. Tillery's testimony explaining the Pittsburgh situation and operation is more valuable than that of any other witness. It is in general undisputed and in effect establishes the following facts:

While Kaplan is a large concern with terminals and certificated routes in 8 states, it did not own the equipment in Pittsburgh in any case where Pittsburgh was the driver's home base. In Pittsburgh it generally used the services of Pittsburgh owner-operators. The loads out of the Pittsburgh terminal were 100% steel. Kaplan was so short of equipment that returned trucks were sent out as soon as they came in. As fewer steel loads came back into Pittsburgh because the steel was moving out, not in, the owner-operators, if they had not been able to trip lease to other concerns, would have operated empty a large part of the time. They therefore insisted upon making trips for other carriers when they could not get a load from Kaplan. That Mogielski had such an under-standing with Kaplan is undisputed.

Since Kaplan had certificates for irregular routes, the individual drivers could choose their routes. Hence Tillery could not know the route on which a driver would return to Pittsburgh.

Kaplan failed to exercise over its owner-operators, at least in the area here involved, the control required under Administrative Rule 4 of the Bureau of Motor Carriers, Interstate Commerce Commission, that the operation under which a vehicle is leased and operated for Kaplan by an owner-operator "must be conducted with the supervision and control of such carrier."

Both Tillery and DeVaull stated that no written rules for operation were given by Kaplan to the owner-operators. Thus Mogielski or Fotta was supposed to call the Kaplan terminal in any place where there was a Kaplan terminal before accepting a load from another concern, but no written rule existed to that effect. While Mogielski said his contract was to give priority on loads to Kaplan, Tillery said that Mogielski could hire his equipment out to other concerns without con-

sulting Kaplan. Mogielski said the only instruction he received from Kaplan when he got a load was "where to deliver it." No record was kept by Kaplan of the calls for loads. Tillery said the trip lease used in the "wildcat" transactions controls the driver only until he reaches the point of delivery and at that point the vehicle is his again. To a question, "So when he is empty he is your man until he takes another load, isn't he?" Tillery answered, "That's right." Tillery stated it would be proper for Fotta to come back empty on December 31st and take his next load out two days later. If a driver was as far away as Buffalo and could get back before the holidays, Tillery said, Kaplan gave him no instructions, and Fotta was entitled to deadhead back to Pittsburgh as his home terminal. Kaplan had issued instructions that his equipment was not to be on the road on holidays.

This testimony establishes two facts: (1) The Transamerican trip lease was authorized by Kaplan and was not a deviation and (2) The return of Fotta to Pittsburgh was authorized by Kaplan.

We therefore are not concerned with the somewhat conflicting testimony as to Fotta's movements between Columbus and Mansfield December 28 to December 30 (when he started for Buffalo). Whether or not these movements, permitted by Kaplan, were deviations is immaterial. Decision here turns upon the status and legal relationship existing between Kaplan and Mogielski, who gave orders to Fotta, after the delivery of the Transamerican load in Buffalo and the expiration of that particular trip lease. It is undisputed that the Transamerican load was delivered in Buffalo on the morning of December 31 and that Fotta started back to Pittsburgh about noon on that day. The lease between Mogielski and Kaplan was still in effect and governed the parties immediately upon delivery of the Transamerican load. As Tillery said, when Fotta started home empty he was again Kaplan's man. The fact that Buffalo was a long way from

Columbus and that a route to Pittsburgh from Columbus via Buffalo was not entirely direct is immaterial. The route from Buffalo to Pittsburgh via Erie and Route 19 was as direct as any route could be over the hills of northwestern Pennsylvania and the watersheds of streams flowing into the upper reaches of the Allegheny. Both the Buffalo to Pittsburgh route via Erie and Route 19, where the accident occurred, are certificated Kaplan routes.

The temporary but permitted deviation from employment by Kaplan ended upon the delivery of Transamerican goods. Ordinarily when an employee deviates or departs from his employment and thereafter resumes his duties the relation of master and servant is restored. Restatement of the Law of Agency, Section 237; United States v. Wibye, 9 Cir., 191 F.2d 181.

Tillery's testimony demonstrated that Fotta's return run to Pittsburgh on any Kaplan route was within the contemplation of Kaplan and Mogielski and was an expected incident of the outbound trip for whose safe completion Kaplan was responsible. The relation of master and servant had been restored and Kaplan was liable for the negligence of his servant on the inbound trip. Marriott v. National Mutual Casualty Company, 10 Cir., 195 F.2d 462; Hodges v. Johnson, D.C., 52 F.Supp. 488; American Transit Lines v. Smith, 6 Cir., 246 F.2d 86, certiorari denied 355 U.S. 889, 78 S.Ct. 261, 2 L.Ed.2d 188. It is undisputed that the Kaplan operation did not contemplate return to Pittsburgh by any particular route. As Tillery said, the men were "not told to come right to Pittsburgh." In answer to a question that when a man left Pittsburgh "you are never sure from what direction he is going to be coming back in empty?" Tillery said, "That's right." He said that he raised no question as to how Fotta came in from where he was.

The majority opinion holds that the Marriott case does not control as to the Buffalo-Pittsburgh leg of the journey.

First, it concludes that the collision in the Marriott case happened upon the direct homeward route while the accident here did not.

With due deference to the opinion of my colleagues, I cannot agree that this comparison is correct. Womack, whose negligent driving was held to have caused the accident involved in the Marriott case, was the owner and driver of the truck leased to S & C, a certified carrier. He made delivery of a load for S & C at Miami, Oklahoma. He did not return to the home terminal of S & C from Miami. After going to Tulsa, Womack carried a load under a one-way trip lease for Riss & Co. to Wichita. This trip was a deviation just as was the trip to Buffalo in the instant case. It was no part of the performance of the contract to deliver goods for S & C that Womack should go first to Tulsa and then to Wichita and haul for another concern. When Womack returned from Wichita to Hutchinson, Kansas, the S & C home base, he was returning empty after delivery of a load, which trip constituted a departure from his contract with S & C just as Fotta was returning after the Transamerican transaction. Womack traveled a certificated S & C route and Fotta traveled a certificated Kaplan route. The route Fotta took from Buffalo to Pittsburgh was as direct, though not so straight, as that Womack took from Wichita to Hutchinson. It was when Fotta was again Kaplan's man, traveling to his terminal city as he had a right to do, that the accident occurred. The Marriott case cannot be distinguished on this point.

The majority opinion points out as the second difference between this and the Marriott case that in Marriott there was no suggestion that after the delivery under the trip lease the driver was on a personal mission of his own. The only evidence in favor of appellant on this point was that Fotta said he was going home and also, when asked whether he was working for Kaplan, he said "No." The majority opinion holds that the court was in error in refusing an instruction requested by Kaplan upon this point to the effect that, when a servant goes upon a mission of his own and makes a clear and complete deviation and departure from the scope of his master's business, as a matter of law the master is not responsible for the act of the servant during the period of such deviation and that, if Fotta was upon a personal mission of his own, and had made a clear and complete departure from the business of Kaplan and the scope of his employment by that company on his return to Pittsburgh from Buffalo, Kaplan would not be responsible for any acts of Fotta at the time of the collision.

On this point the record is also clear. Fotta and Mogielski both lived in Pittsburgh. Their terminal was Pittsburgh. Kaplan's orders for loads were delivered to Fotta by Mogielski, and Mogielski, who hired Fotta and paid him, told Fotta to take the Transamerican load to Buffalo, dump it, and come back. It is true that Fotta said that he was going home when he left Buffalo. He was obeying Mogielski's order. It is also true that he said on the return trip he was not doing work for Kaplan. He was carrying no load for Kaplan.

The fact that Fotta desired to be in Pittsburgh for the New Year in no way conflicted with his service to Kaplan in returning the empty truck to Pittsburgh. Undoubtedly Mogielski, who was the owner and in touch with Kaplan, knew that he would get a load out of Pittsburgh. Tillery comments on the fact that Mogielski insisted that his equipment be used continually. This was the reason that Mogielski would take a permanent lease with Kaplan only on condition that he could haul for other concerns if Kaplan did not give him loads. On Route 19, Kaplan's route, Fotta, who at that point was Kaplan's man, was driving the empty truck to Pittsburgh, the city of the home terminal, as the jury evidently found, with the intention of reporting to the dispatcher for a load when he could get a load, presumably on January 2.

As stated in Restatement of the Law of Agency, Section 236, the fact that the driver may have a dual purpose to be accomplished contemporaneously, for instance, the personal mission of returning home as permitted by the master and the master's mission of returning the leased equipment for the next load, does not destroy the agency relationship. United States v. Wibye, supra, 191 F.2d 183; Ryan v. Farrell, 208 Cal. 200, 280 P. 945. The requested charge ignored this rule. It did not specify that if Fotta was proceeding solely and entirely on a personal mission Kaplan would not be liable.

It cannot be maintained under this record that Fotta at the time of the accident had made any departure from the business of the Kaplan Trucking Company and the charge was rightly refused. Moreover, as to the instructions given, because of Kaplan's rule of not driving on a holiday, no load would have been given to Fotta in either Buffalo or Pittsburgh. Fotta could not have had a specific intent to go directly to the terminal to secure a load that night. The instruction of the court that the jury should find whether Fotta had the "general intention after completing his return trip to report to Kaplan's Pittsburgh dispatcher for a load" was not prejudicially erroneous.

As the final deadhead portion of the return trip was a reasonably necessary incident of the outbound journey, the rationale of Marriott v. National Mutual Casualty Company, supra, requires affirmance of this case. The carrier's duty is to control its drivers, Dixie Ohio Express, 17 M.C.C. 752. The fulfillment of its full responsibility under the rulings and decisions of the Interstate Commerce Commission quoted in the majority opinion requires that the risk of the contemplated and customary empty return should be borne by the certificated carrier which, under its franchises, puts the dangerous instrumentality into motion on the highway on the loaded outbound trip.

The judgment should be affirmed.