BEATTY, Justice.
The defendant Vulcan Freight Lines, Inc. (Vulcan) appeals from the denial of its motion for judgment N.O.V. or, in the alterna *434 tive, for a new trial following a verdict for the plaintiff, Ann Buckelew. We affirm.
The lawsuit arose out of an occurrence in which a truck-tractor owned by Kenneth Ingram ran into Buckelew’s house. At that time Ingram and Vulcan were parties to an owner/contractor-motor freight carrier lease agreement, involving a tractor-trailer, with Ingram being the owner-lessor-contractor and Vulcan being the carrier-lessee. The pertinent clauses of this lease agreement were clauses 2, 3, 5 and 16.
In Clause 2 Ingram as contractor warranted the tractor-trailer to be in safe mechanical and operating condition “in complete compliance with the Department of Transportation rules and regulations relating to safety; and that such vehicle [would] be so maintained by ‘Contractor’ during the term of this contract.” Also, Ingram as “Contractor” agreed “to pay the entire cost of operating said vehicle, . . . including . . . parts, repairs. . . .”
Under Clause 3 Ingram was obligated to provide “all labor and service herein provided for, or employ all necessary drivers, . mechanics or other persons competent and qualified to perform the work required hereunder . . . .”
Clause 5 provided: “ ‘Carrier’ [Vulcan] will not secure nor assume liability for Public Liability or Property Damage insurance covering operation of motor carrier equipment (either tractors or trailers) when such is not being operated at ‘Carrier’s’ direction or performing transportation under terms of this contract. ... In the event that ‘Carrier’ is sued by third parties in regard to liability arising from operation of motor carrier equipment while not under the direction of ‘Carrier’ or under the provisions of this contract, ‘Contractor’ agrees to assume any and all liability arising from such actions, including legal and court expense and reimburse ‘Carrier’ any sums that ‘Carrier’ may be required to expend.

And Clause 15 provided: “Subject to the provisions of this contract, the ‘Carrier’, during the term of this contract, shall have the exclusive possession, control and use of said equipment, and shall assume full and complete responsibility to the public . . .”
Ingram, the owner-lessor-contractor of the tractor-trailer, operated a motor freight business and á repair shop for tractors and trailers, about five miles from Attalla on U.S. 11 South. On June 22,1977, one of his drivers, Junior Knight, drove the leased tractor-trailer for Vulcan to Birmingham with a load of steel. He did not have a load of freight to pick up in Birmingham, so he returned to Attalla with an empty trailer. On his return trip to Attalla he observed that the engine was “running hot,” so when he arrived at Ingram’s repair shop near Attalla around 5:00 o’clock p. m., he and Ingram commenced repairs which consisted of replacing the thermostat. The repairs were finished around 9:00 p. m., and Ingram and Knight went into the shop to clean themselves. While inside, Knight obtained a pickup order for the next load for Vulcan, a shipment of steel from Republic Steel. This load could not be picked up until 7:00 a. m. the next morning. After remaining in the shop for a few minutes, Ingram and Knight started out to check the tractor whose engine had been left idling to disclose any leaks in the cooling system. They saw that the driverless tractor and its empty trailer had rolled out of Ingram’s driveway, traveled across the highway, and had struck the plaintiff’s house.
The plaintiff Buckelew filed a complaint against Kenneth Ingram to recover damages for his negligence or wantonness in “controlling” the truck. By amendment Vulcan was added as a party defendant. Vulcan then filed a cross complaint against Ingram based on Clause 5 of the lease agreement, alleging that at the time of the accident Ingram’s actions were outside the line and scope of any alleged employment with Vulcan Freight Lines. A jury trial ensued, and after evidence was taken Vulcan moved for a directed verdict, primarily on the ground that the evidence did not establish that Ingram was acting in the line and scope of his employment as an agent, servant or employee of Vulcan at the time *435 of the occurrence. The trial court granted the motion as to the wantonness claim, but denied it as to the negligence claim. The jury returned a verdict in favor of the plaintiff, hence this appeal by Vulcan. (Ingram did not appeal).
The relationship between parties similarly situated, and the ensuing problem of vicarious liability, has been before this Court on prior occasions.
In Stevens v. Deaton Truck Line, 256 Ala. 229, 54 So.2d 464 (1951), a lease agreement substantially like that involved here was interpreted to establish a master-servant relationship between the parties. The question of the tort liability of the carrier-lessee, therefore, rested upon the doctrine of respondeat superior; that is, whether on the occasion in question the act done was within the line and scope of the duties of the owner-contractor, and was committed in their accomplishment. In that case the owner-lessor was held not to have been engaged in performing the duties of the owner-contractor because at the time in question his mission was purely personal (returning home from the lessee’s terminal). This Court held that “no possible benefit” could have been derived by the carrier-lessee because no freight was being hauled and none could be hauled — the trailer not being attached at the time of the accident.
A case dealing with an agreement similar to the one in Stevens, supra, is Deaton Truck Line v. Acker, 261 Ala. 468, 74 So.2d 717 (1954). Although the claim was for Workmen’s Compensation benefits, nevertheless, following Stevens, the entitlement depended upon the relationship in being between the carrier-lessee and the owner-lessor, i. e., whether the truck operator, at the time of the accident, was “in or about the business or duties assigned to him by his employer.” Acker, supra at 261 Ala. 472, 74 So.2d at 720. In that case the owner-lessee arrived at the lessor’s terminal in Birmingham from New Orleans and then proceeded to his home in Bessemer where several days later, outside of the carrier’s supervision or control, he was engaged in repairing the truck’s gasoline tank when it exploded, resulting in his death.
In holding that the carrier-lessee was not liable for that death (because the accident did not arise out of the course of his employment by the carrier) this Court referred to that part of the lease agreement which dealt with the owner-lessor’s obligation to keep the motor vehicle in good mechanical condition and to repair and furnish parts at his own expense (as in Clause 2 here). The Court continued:
Our interpretation of the written agreement here involved is that while the motor vehicle was out of service and being repaired, it was under the sole jurisdiction and control of Acker, whose duty it was to have it repaired at his own expense. He was privileged to select the place where, and the person by whom the repairs should be made.
At the time Acker was killed, the motor vehicle was out of service and out of commission so far as the work of transportation was concerned and incapable of earning compensation for him under his contract of employment. Acker selected the place where the repairs were to be made, at his home, a place where Deaton had no connection and where the business of Deaton did not require the presence of Acker. He elected to make the repairs himself.
In Thomas v. Hubbert, 280 Ala. 302, 193 So.2d 746 (1966), there was a lease agreement between a carrier-lessee and an owner-lessor which included terms substantially like those in Clause 2 of the instant contract. At the time of the accident in question the truck driver was driving his tractor en route to the carrier’s freight yard, returning from his brother’s home where he had gone to assist in starting his brother’s truck. His brother was also an owner-lessor of the carrier-lessee. The driver, thus, was not hauling freight, but had been at the freight yard to have a safety inspection made. In concluding that the question of the liability of the carrier-lessee was governed by Stevens, supra, this Court held that the brother’s arrangement with the carrier required him to keep his truck in *436 running condition, and that neither was hauling freight or on any business for the carrier at the time of the accident. We added:
Malone [the carrier-lessee] could not have had any interest in whether brother William’s truck would start on this occasion or not. The company would be concerned only that he was available to haul a load when scheduled, which under the evidence was not until some time later. We can see no benefit which Malone gained from Hubbert’s trip to help his brother.
The case of Cox v. Howard Hall Company, 289 Ala. 35, 265 So.2d 580 (1972), contains a review of the cases cited above, and reiterated the position on which those decisions was based. That is, the liability of the carrier was dependent upon whether the driver of the truck-tractor was at the time of the accident acting within the line and scope of the duties to be performed under the lease agreement for the carrier-lessee. In Cox, the truck driver had observed difficulty with the alternator, and, having no immediate duties with the carrier, drove the leased truck without a trailer on his way to a battery shop when the accident occurred. This Court concluded that under the evidence the driver was not acting for the carrier. Because the Court quoted extensively from Thomas, supra, it is apparent that the Court viewed the facts as establishing that the driver was engaged in a mission solely personal to himself.
The most recent decision under an agreement of this kind is Harbour v. Colonial Fast Freight Lines, Inc., Ala., 336 So.2d 1100 (1976). A summary judgment case, the question on appeal was whether under the facts before the trial court on that motion there existed a genuine issue of fact that the owner-lessor was acting within the line and scope of his employment with the carrier-lessee at the time of the accident. The parties were operating under a lease agreement similar to the one presently before us: the lessor was to maintain the leased vehicle in proper operating condition; he was to assume repairs and maintenance costs. The lessor, one Matthews, while operating the tractor picked up a loaded trailer at the lessee’s Birmingham terminal containing freight bound for South Carolina. That same day the trailer was unhitched and parked near Matthews’s home in Eto-wah County, between Birmingham and the destination. Two days later a mechanic repaired the tractor and was paid by Matthews. While Matthews was road testing the tractor he was involved in an accident. The trial court granted summary judgment to the carrier. This Court reversed that order, holding that there was a question of fact as to whether Matthews was acting within the scope of his duties under his employee relationship with the carrier. On appeal the carrier argued that it could not be held liable for Matthews’s operation of the tractor unless Matthews had been hauling freight for it; that he was fulfilling an obligation under the lease at the time and not furthering the business of the carrier. This Court, however, determined that to be a question on which reasonable minds might differ. The Thomas and Acker cases were distinguished in that their evidence showed the operator to have been engaged in activity solely for personal benefit.
Does this case contain facts which distinguish it from those cases? Admittedly, the owner-lessor was not hauling freight at the time of the accident, but does the evidence indisputedly establish that he was not engaged in his duties for the carrier? If there was any reasonable inference arising from the evidence which furnished a scintilla in support of the theory that Ingram was engaged in duties under his contract with Vulcan, then it was proper to give the question of Vulcan’s respondeat superior liability to the jury. Pettway v. Pepsi Cola Bottling Co., Ala., 337 So.2d 757 (1976).
Here the evidence establishes that, having delivered a load of freight to Birmingham, Ingram’s driver was en route to pick up another load for Vulcan at the Republic Steel plant in Gadsden. The faulty thermostat was the reason that mission was unfulfilled. Under the arrangement between them, Ingram could dispatch trucks to the Republic Steel plant without a dispatch *437 from Vulcan. He would get calls from the Steel plant and dispatch a truck there. And according to Vulcan’s dispatcher, the lease agreement would commence at the time a truck was dispatched to pick up the load. And it was uncontradicted that the driver, Knight, had gone into the shop, and while there, he was handed the pick-up order for the next load which he could have proceeded to obtain but for the lateness of the hour. Thus, under the evidence one might reasonably conclude that the truck was being operated for the carrier’s benefit on the return from Birmingham to pick up another load when the repairs became necessary. Or, the “lease agreement commenced,” and benefit to Vulcan occurred, when the driver received his dispatch order while in the shop after those repairs had been effected. Under either of those alternatives a jury could have reasonably found that Ingram was engaged in Vulcan’s business at the time of the accident as well as his own under the lease. The factual distinction between this case, where the shipment had not been received by the owner-lessor, and Harbour, where it had been received but its continued carriage interrupted to effect repairs, is not controlling since, as we have noted, the driver here was en route to pick up a shipment and would have done so had not the repairs become necessary before he could continue.
The motions urged upon the trial court by the defendant Vulcan were properly denied. It follows that the judgment must be, and is, affirmed.
AFFIRMED.
TORBERT, C. J., and MADDOX, JONES and SHORES, JJ., concur.